# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **CRIMINAL ACTION FILE** |
| **v.** ) | |
| ) | **NO. 1:06-CR-442-TCB/AJB** |
| **MARCUS WATKINS,** ) | |
| ) | |
| **Defendant.** ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## <u>FINAL REPORT AND RECOMMENDATION</u>

On July 27, 2007, Defendant Marcus Watkins pleaded guilty to Count Two of the indictment, [Doc. 1], which charged him with using, brandishing and carrying a firearm during the crime of violence (a robbery in violation of 18 U.S.C. § 1951), in violation of 18 U.S.C. § 924(c)(1)(A)(ii). [Doc. 46]. He subsequently filed a pro se motion to enforce the plea agreement, contending that the Government improperly withheld filing a motion under U.S.S.G. § 5K1.1. [Doc. 86 (under seal)]. He was appointed counsel. Two hearings were held, [Doc. 109 (before then-District Judge Carnes,(hereinafter "T1") (under seal); and Doc. 179 before Magistrate Judge Walker (hereinafter "T2")]. The Court reviewed 16 boxes of an archived file concerning another individual that Watkins contends demonstrate that he was treated differently. Watkins has yet to be sentenced. (*See* Dkt.). The undersigned concludes that Watkins

has failed to establish that the Government breached the plea agreement and therefore

**RECOMMENDS** that the motion be **DENIED**.[1]

## I.       *Introduction*

On September 28, 2006, a criminal complaint issued charging Defendant with

possession of a firearm after having been convicted of one or more felonies, in violation

of 18 U.S.C. §§ 922(g) and 924(e).  [Doc. 1].  He subsequently was charged by way of

indictment, alleging commission of a Hobbs Act robbery in violation of

18 U.S.C. § 1951 (Count One); using, brandishing and carrying a firearm during the

Hobbs Act robbery, in violation of 18 U.S.C. § 924(c)(1(A)(ii) (Count Two); and

possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g) and

924(e) (Count Three).  [Doc. 9].

On July 27, 2007, Watkins pleaded guilty to Count Two, which carried a

minimum mandatory term of imprisonment of 25 years and a maximum sentence of

Life.  [Doc. 46; Doc. 88 at 16-17].[2]  His plea agreement provided, *inter alia*, and

_____

[1]       This case was assigned to the undersigned upon Magistrate Judge
Walker's recusal.  [Doc. 189].

[2]       The plea agreement provided that in the absence of a Government motion
under U.S.S.G. § 5K1.1, the Government would recommend a within-the-Guidelines-
range sentence of 360 months and that in that circumstance, Watkins would not ask for
a lower sentence.  [Doc. 46-1 at 7 (¶ 11)].

2

Defendant was advised at his guilty plea, that it was up to the Government to evaluate

whether or not any cooperation he gave the Government rose to the level of substantial

assistance triggering the Government's decision to ask the sentencing court for a pre-

or post-sentence reduction of sentence.  [Doc.  88 at 16; *see also* Doc. 46-1 at 4-5[3]].

---

[3]     Defendant's plea agreement also provided, in relevant part, as follows:

6.     The Government agrees to make the extent of the defendant's cooperation known to the sentencing court.  In addition, if the cooperation is completed before sentencing and the Government determines that such cooperation qualifies as "substantial assistance" pursuant to Title 18, United States Code, Section 3553(e) and/or Section 5K.1 of the Sentencing Guidelines, the Government will consider whether to file a motion at sentencing recommending a downward departure from the applicable guideline range.  If the cooperation is completed after sentencing and the Government determines that such cooperation qualifies as "substantial assistance" pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure, the Government will consider whether to file a motion for reduction of sentence.  In either case, the defendant understands that the determination as to whether he has provided "substantial assistance" rests solely with the Government.  Good faith efforts by the defendant that do not substantially assist in the investigation or prosecution of another person who has committed a crime will not result in either a motion for downward departure or a Rule 35 motion.  The defendant also understands that, should the Government decide to file a motion pursuant to this paragraph, the Government may recommend any specific sentence, and the final decision as to what credit, if any, the defendant should receive for his cooperation will be determined by the Court.  If the defendant fails to cooperate truthfully and completely, or if the defendant engages in additional criminal conduct or other conduct inconsistent with cooperation, he will not be entitled to any consideration whatsoever pursuant to this paragraph.

3

His October 11, 2007 sentencing date was continued by the District Court.  [Doc. 53; *see also* Doc. 66 (under seal)].

On July 13, 2009, Watkins filed a motion to enforce the plea agreement.  [Doc. 86 (under seal)].  The Government responded, [Docs. 93, 144], and as noted, two hearings were held.  Because neither the undersigned nor the District Judge to whom this case now is assigned presided at the evidentiary hearings, the Court sets out all of the testimony presented at these hearings.

## II.    *Facts*

The core facts are not reasonably in dispute, and many of the exhibits and the transcript of the hearing before Judge Carnes are filed under seal, the Court summarizes the facts as follows:

Watkins testified at the hearing before Judge Carnes.  He had been convicted of armed robbery and weapon in the late 1990s and,  in order to get a reduction of sentence, cooperated with the Government about guns and violent crimes in the Pittsburgh area of Atlanta.  T1:52-55.  In the course of that cooperation, Watkins learned of and disclosed to the Government a scheme where several inmates bought information from another inmate, and several of the buying inmates were going to

———————————————

[Doc. 46-1 at 4-5].

4

testify at a federal trial about information about which they had no personal knowledge. T1:55. As a result of Watkins' providing of that information to the Government, those witnesses were not used and Watkins received for his cooperation a reduction of sentence from 210 months to 90 months. T1:56.

Once Watkins was released from prison on that earlier sentence in 2002, he continued to cooperate with the Government until he relapsed on drugs and in 2003, in the middle of cooperating, removed the wire he was wearing. T1:56-59.

Once Watkins was back in custody on the present case, and after he entered his guilty plea, over the course of more than a year, Watkins provided information to federal and local law enforcement about smuggling of contraband into the Atlanta City Detention Center ("ACDC") by some of the guards; as well information that a female posing as an attorney had sex with an inmate, that a lawyer smuggled contraband into the jail for his client, and about crimes that occurred outside the jail on the streets of Atlanta and at local businesses, including crimes that Watkins had committed and also police misconduct (a police officer sodomizing a woman). T1:9-16, 28-33, 34-35, 45.

Watkins also began selling, to at least five other inmates, information that he received from someone outside the jail. T1:60-67, 68-72; Govt. Exh 2 at Bates Nos. 12-13. For example, in 2008, Watkins charged another inmate, named

Lowe, $1500 for information, with a $200 down payment.  T1:67.  The Government found out about the scheme when one inmate referred to law enforcement agents the internal jail letters that Watkins was sending to facilitate the scheme.  *See* Govt. Exh. 2; T1:72.  Watkins wrote to at least one other inmate and complained that this would " 'F' all of you nigga's shit," a reference to this other inmate's telling the authorities about this scheme.  T1:71.  When one inmate did not pay on time, Watkins threatened to have the U.S. Attorney's Office advised that the information the inmate was providing was false.  T1:76.  Although Watkins initially contended that federal law enforcement agents were aware of what he was doing, he backtracked that statement upon questioning by Judge Carnes.  T1:77; *see also* T1:90 (Watkins explaining that he never told ATF Special Agent Peter Beck that he was selling information because "I never had to tell him, never thought I had to tell him.  I thought he already– you know, he already knew.").  On one occasion, another inmate obtained information without paying for it because of a relationship that the inmate had with Watkins's cousin, who was supplying some of the information and obtaining the payments on Watkins's behalf.  T1:79-80.  On another occasion, Watkins complained when it appeared that an inmate was not going to use timely information provided to him, because then Watkins would not get paid.  T1:81.  Watkins also solicited other persons'

6

information for sale.  T1:83-84.  To say the least, the Government was concerned about Watkins's cooperation and credibility because he was providing information to other inmates so that they could obtain reductions of their sentences for substantial assistance under U.S.S.G. § 5K1.1.  T1:20, 21.

Watkins testified that the scheme he disclosed and cooperated against in the 1990s was different from what he was doing in 2008 because, he claimed, in the latter situation, there was no intent that the inmate buying the information would testify but only that the information would be used to start or assist an ongoing investigation or to make an arrest.  T1:91.  He further testified that, in the latter scenario, the inmates receiving information could not testify, because they would be unable to identify the defendant who was the target of the cooperation in court.  T1:91-92.  However, Watkins did not instruct these inmates to tell the agents that they had purchased the information.  T1:92.  Instead, he instructed these inmates on which agents to call, agents that Watkins testified were aware that he was selling this information.  T1:94.[4]

---

[4]      Watkins testified as follows:

They told me I could make money by hooking other inmates up with Katrina [McCurdy, his cousin] and I could make money that way.  As long as the information was being submitted to federal agents, to them, directly to them, I could make money that way, yes.  They told me not by selling it.  I didn't sell it.  If I introduced these inmates, got the

7

Nonetheless, he testified that one inmate, Leon Lumsden, told Agent Beck that he had received the information from Watkins because the information he relayed was in Watkins's very distinctive handwriting.  *Id.*

During one debriefing, on July 6, 2008, Watkins was asked about information that Watkins had provided to another inmate.  T1:33-34.  On August 26, 2008, Watkins related that he was providing information to other inmates so that those inmates could receive a benefit.  T1:15, 34.  Watkins reiterated that he believed that as long as the information was being submitted to start or assist in an investigation or making an arrest, and not to be testified to, such an arrangement was proper, he had been doing this since 1996, and the Government's agents acquiesced in it.  T1:34-35.

On November 24, 2008, after Watkins wrote a letter to the then-U.S. Attorney, Watkins told his debriefers that a cooperating defendant in another case was allegedly told by an Assistant U.S. Attorney and an ATF agent to keep quiet about undercover work at a business establishment in Atlanta, but he also reported that he did not have

---

information from Katrina or outside sources, I used my outside sources to make me a few dollars to maintain while I was incarcerated.

T1:95.

8

first-hand information.  T1:16, 23-24, 37-38.[5]  On January 2, 2009, Watkins told a representative from the Justice Department's Inspector General's Office ("IG") that in being prepared to testify, he was advised by a different AUSA and a law enforcement agent[6] how to testify and to "juice up his testimony" and to "provide testimony on a case that I had no knowledge of," i.e., to provide bogus information on a case.  T1:18, 44, 97-98, 100; *see also* Exh. 70 (under seal).  He also told the IG about HIDTA officers that were harassing people and "trumping up charges."  T1:44.

He claimed that information he gave to law enforcement led to the indictment and arrest of at least three individuals.  T1:46-47, 47-48, 50; Def. Exs. 1, 2, 3.

Watkins further admitted that he did not tell Agent Beck or FBI Special Agent Mile Brosas that he was selling information to other inmates.  T1:105.  He claims, however, that they knew that he was doing this because they knew that he was referring inmates to them and to other law enforcement agents to provide information.  T1:106-07.

_____

[5]     The nature of the allegation is that law enforcement had been making drug buys in a club, that a murder occurred there, and that law enforcement did not want it reported that they could and should have made arrests at the location before the killing. T1:39-40.

[6]     Watkins testified that he did not disclose the name of the ATF agent to the IG, but that he was referring to Agent Beck.  T1:99.

9

During a break in the hearing before Judge Carnes, the Government brought to the attention of the Court and defense counsel that Lumsden gave money for living expenses to a person that was cooperating on his behalf, and the FBI knew that he did so. T1:114-15.[7] Judge Carnes expressed her strong displeasure with the Government's allowing "vicarious cooperation," i.e., giving sentence credit to an inmate for cooperation given by the inmate's relative or friend, T1:115, with the Government attempting to distinguish that practice from what it accused Watkins of doing, that is, selling information to other inmates.  T1:116.

Agent Beck testified before Judge Carnes that he met Watkins in 2006 following arresting him on the current charge.  T1:119.  In June 2007, Watkins wrote Beck that he wanted to cooperate, and Beck contacted AUSA Jordan.  They then met with Watkins on July 27, 2007, the day he pleaded guilty.  T119.  Present were Beck, ATF TFO Tim Brown, ATF TFO Rick Hedges, FBI SA Brosas, Deputy U.S. Marshal Richard Kennedy, and AUSA Jordan.  Watkins was represented by counsel, and Watkins told the Government about his accomplice in the robbery to which he pleaded guilty, and that he and his accomplice had received the firearms used in the robbery

---

[7]    The Government explained that the informant in that case was actively making drug buys for the Government.  T1:117.

10

from a drug dealer named Paul Patrick, a/k/a Pork Chop.  T1:127.  He also provided information about crimes that he committed, crimes committed by others, and corruption at ACDC.  T1:119.

Beck testified that after Watkins identified his accomplice, law enforcement attempted to find corroborative evidence, but the robbery victim no longer wanted to cooperate and the investigating agents could not find the accomplice in order to interview him.  T1:122.  They also unsuccessfully searched for Patrick.  T1:124.  None of the other information about crimes on the street panned out.  T1:125-127.[8]  It was apparent to Beck that Watkins was receiving information from third parties because his information was framed as describing current events, but Watkins was in custody.  T1:128-129.[9]

In early 2008, Beck and Hedges met with Lumsden in pretrial detention after Lumsden's attorney told Beck that Lumsden wanted to provide information to law enforcement.  T1:130.  Lumsden told them that he wanted to provide information in

---

[8]    On one occasion, at Watkins's lawyer's suggestion, Beck masqueraded as a federal public defender staff member so he could meet with Watkins and his lawyer at the jail.  T1:127, T1:130.

[9]    Judge Carnes's questioning reflected her concern that Beck did not ask Watkins where he received his information until he got an answer.  T1:129.

11

exchange for sentence consideration like Watkins, which shocked Beck because it meant that people in custody knew that Watkins was supplying information to law enforcement. T1:131-32. Beck considered Lumsden's information contemporaneous, and Lumsden never gave up his source of information.  T1:132, 134.  Beck sent a confidential informant ("CI") into the Game Room, a club where Lumsden stated the owner was involved in criminal conduct, but that the CI reported only marijuana sales and pills by patrons, but no violent or firearms crimes involving the owner.  T1:132. Beck also spoke with DeKalb County law enforcement about the Game Room.  T1:133. Then, on May 30, 2008, a shooting occurred between a crowd outside that location and a security guard.  According to Beck, the confrontation was unrelated to the Game Room, but that the Game Room coincidently was the location where the two rival groups converged.  T1:141.  Lumsden contacted Beck in an effort to provide information, and Beck offered Lumsden's services, along with the earlier mentioned CI, but the offer was rejected by DeKalb County because they already had a cooperator in the investigation.  T1:133-34.

In July 2008, ATF Agent Robison met with Watkins, and relayed the debriefing to Beck.  Watkins gave information on criminal activity in the English Avenue area and

also on Metropolitan Boulevard, but it all was deemed historical information that the ATF could not act upon.  T1:135.

Beck also recounted that when Watkins attempted to provide information on matters outside of the ATF's jurisdiction, he would pass along the information to other agencies.  Thus, he spoke to HIDTA about information that Watkins gave about large drug transactions in the Pittsburgh area of Atlanta, but HIDTA did not want to work with Watkins based on its prior experiences with him.  T1:136-37.  Clayton County authorities and the FBI also concluded that other information from Watkins concerning child pornography was not valuable.  T1:137.

Beck also testified that on the same day that Watkins claimed that he and AUSA Gale McKenzie covered up information about the Game Room, Watkins told him that he had more information to give to him.  T1:138.  Prior to those allegations, Beck had been advised by the U.S. Attorney's Office to not have any additional contact with Watkins because his information was not credible.  T1:138-39.  Beck also stated that he was advised that the investigation (styled as a "preliminary inquiry") into his and McKenzie's alleged misconduct concerning the Game Room was closed due to lack of merit.  T1:140-41.

13

While Beck followed the directive not to work with Watkins, Watkins continued to send letters to Beck containing information that he wanted Beck to act upon. T1:139; Govt. Exh. 1. Around December 2008, Beck just began filing the letters without opening them. T1:140. However, in May 2009, around the time of his interview with Internal Affairs, Beck opened a letter in which Watkins was offering to disclose defense strategy of an ATF defendant named Marlandow Jeffries. T1:142-43. He also reviewed letters concerning Watkins's report of criminal actions victimizing Home Depot, which allegations both Home Depot security and the Atlanta Police Department concluded were not enough for them to act upon. T1:143-45.

Beck testified that while Watkins was motivated and respectful, the information that he provided either was not sufficient to start or continue an investigation, or was already known to law enforcement. T1:146. Also, over time, his information became "more grandiose," to the point that it was "cartoonish" and reflected a desperation on Watkins's behalf. T1:147.

Towards the end of 2008, Beck learned that Watkins was receiving information from people outside of custody and selling that information to inmates. T1:146. He denied ever telling Watkins that this practice was acceptable, nor did he authorize him to do so. T1:147, 148. He also denied that he recruited Watkins to give perjured

14

testimony, or that he recommended that Watkins not get a reduction in sentence due to his allegations against him, stating that "[e]ither his information fans [*sic*] out or it doesn't." T1:147-48. Watkins did not cross-examine Beck. T1:148.

SA Brosas testified that he began debriefing Watkins in July 2007, when Watkins gave information concerning the smuggling of contraband into ACDC by correctional officers and sexual encounters between inmates and visitors, including the inmate-ringleader of the smuggling operation and two correctional officers. T1:150-51. Brosas again debriefed Watkins in October 2007, and he gave information on several inmates and another correctional officer. T1:152. Brosas attempted to follow up with this information with DUSM Kennedy, and attempted to corroborate the information by interviewing other inmates. T1:152. Watkins obtained a small amount of marijuana from another inmate and mailed it to his attorney, but Watkins was advised to be only a listening post and not to engage in active work like that without the necessary formal approval. T1:152-53.

With regard to Watkins' information about smuggling into the jail by two correctional officers and the ringleader, information that Brosas thought was credible, Brosas had intended to wire Watkins and using him more proactively, but such a step required formal approval, and his higher ups requested verification of his credibility.

15

In the midst of collecting this verification, it came to light that Watkins was collecting money from other inmates in exchange for information, which adversely affected his credibility.  T1:154-57.  None of Watkins' information lead to a prosecution, and after November 2008, Brosas was instructed not to have further dealings with im.  T1:158.  Watkins did not questions Brosas.  T1:159.

Brenda Summers, of the Department of Justice's IG's Office, testified that in late 2008 and 2009 she received letters from Watkins, and as a result, interviewed him in the presence of his counsel on January 2, 2009 at the Union City Jail.  T1:160-61, 162-63.  In the interview, Watkins made various claims of federal prosecutor and law enforcement misconduct.  First, he made a claim about at least one AUSA and an unnamed DEA agent in 2000 coercing witnesses to testify at trial against an unidentified defendant.  T1:166.  Next, he claimed to have been coerced by two AUSAs to perjure himself before a grand jury in 1999 when he falsely testified about his knowledge of the Pittsburgh Gangsters.  T1:166-67.  Third, he claimed that HIDTA agents coerced one person to provide false testimony about another person, and that Watkins was related to the person who was coerced.  T1:167.  Fourth, he alleged that in 2002, HIDTA agents stole money from citizens to coverup the fact that they lost $3500 in "buy" money, when Watkins took the money to buy cocaine to personally use

16

as opposed to using the money to buy cocaine during the agents' investigation. T1:167-69. Eventually, after learning that the agents were looking for him, Watkins flushed the cocaine, and claimed that when they found him in another's house, the agents displayed the recorder that he had and told everybody that he was a snitch; however, Watkins had told Summers that he had thrown the recorder away but still possessed his agent-supplied Blackberry. T1:169-70.

Fifth, Watkins told Summers that the U.S. Attorney's Office, through Gale McKenzie, and the ATF, through Agent Beck, possessed information to make arrests for gun trafficking at the Game Room, but failed to act in time to prevent a drive-by shooting that resulted in a death. T1:170. He told Summers that Lumsden had provided the information to Beck, which he had received from Katrina (McCurdy), Watkins' cousin who was "street savvy." T1:171. Summers had the impression that Watkins merely put Katrina and Lumsden together and was not involved in transmitting any of the information, but that Lumsden told Watkins all of the information he was imparting to law enforcement, all with the hope of a reduced sentence. T1:171-72. Watkins stated that Lumsden was told by McKenzie that the criminal activities he reported at the Game Room had been confirmed by Beck, but that following the shooting at that location, they were not going forward with any prosecutions in order

17

"to avoid the government liability regarding the drive-by shooting." T1:172. Watkins interpreted Lumsden's remarks to mean that the Government would be embarrassed if it became known that it possessed information that could have prevented the drive-by shooting. *Id.* Watkins also told Summers about an unnamed ATF agent, with whom Lumsden's co-defendant was cooperating, who allegedly made an illegal arrest, and the agent had the co-defendant "backstop the probable cause" in order to show that the arrest was proper, and in exchange, the co-defendant's sentence was greatly reduced. T1:172-73.

Finally, Watkins alleged that he was moved from the ACDC to the federal pen, but that since he previously provided information about a BOP employee, he was mistreated and heard rumors that he was going to be killed; and that, as a result, his lawyer was able to get him moved to the Union City Jail. T1:174.

After obtaining this information from Watkins, Summers inputted it into the IG's system for her management, and other than the allegation related to the Game Room as to Beck and McKenzie, none of the allegations was found to have any merit for further investigation. As to the Game Room claim against Beck and McKenzie, the agencies involved concluded that Watkins' allegations were unsubstantiated. T1:176. Summers also testified that none of the letters that she received from Watkins after she

AO 72A
(Rev.8/8
2)

concluded her investigation warranted re-interviewing him.  *Id.*  She also denied that

Watkins ever made a report to her that Beck asked him to commit perjury.  T1:177.

Summers was not cross-examined.  *Id.*

At the hearing before Judge Walker, David Joe Harvey testified that he was

convicted of possession of drugs and a firearm in Case No. 1:09-cr-148 and received

a fifteen-year sentence, and since his arrest in November 2008, he was in custody at

Union City, Robert A. Deyton in Lovejoy ("Lovejoy"), and U.S.P. Atlanta.  T2:28-29.

He met Watkins at Union City through another inmate, who told him that Watkins was

selling information and that he could probably get a 5K sentence reduction if he dealt

with him, and that several other inmates had received a sentence reduction that way.

T2:30-31.

He met Watkins, who told him information that he was getting from his cousin

on the street, and provided him with addresses and automobiles so that Harvey's people

on the outside could verify the information.  T2:31-32.  Harvey had "his folks" confirm

the addresses and the automobiles associated with them, and thus believed that the

information was truthful.  T2:32.  Watkins thereafter gave him information on a

notepad, and instructed Harvey to memorize it and then destroy it so that he (Watkins)

would not get in trouble.  Then, Harvey was to call his lawyer and tell her that he had

AO 72A
(Rev.8/8
2)

information to provide and that she should try to schedule a proffer session.   T2:33.

Although Watkins advised that Harvey should memorize the information, he never told

Harvey that Harvey should pass off the information as his own.   *Id.*   Watkins told him

that the information would cost between $3000 and $5000 depending on its value to

Harvey.   T2:33.   For example, Harvey agreed to pay Watkins $3000, made up of $1500

cash and tires and rims, memorialized in a letter Watkins wrote to Harvey's mother

before Watkins gave him the information.   T2:35-37; Govt. Ex. 1.   In exchange,

Watkins provided Harvey with information about an Asian gang, T2:40, Govt. Ex. 3,

but the Government was not interested in his information.   T2:40.   When he went to the

proffer session, he lied and told the Government that it was firsthand knowledge.

T2:41.   Harvey, through his mother, only paid Watkins $250, T2:57, despite Watkins'

repeated entreaties to get Harvey's mother to fulfill the full agreed-upon amount.

*See* T2:60-64.

Harvey also testified that Watkins provided him information on corrupt police

officers and a drug operation that Watkins first sent to Harvey's mother, who then

forwarded it to Harvey.   T2:41-42, 59; Govt. Exs. 4 (handwritten), 5 (typed by

Harvey's mother, Sylvia Madden).   Harvey falsely told law enforcement that the typed

information was provided to him by his cousin, whom he refused to identify.   T2:43-44,

Govt. Ex. 5A.  He also lied to law enforcement about personally knowing some of the individuals about whom he was cooperating but rather obtained the information from Watkins.  T2:44, 46-49; Govt. Exs. 7, 8.  Harvey was not cross-examined by Watkins. T2:53.

Watkins testified in front of Judge Walker that he was being denied a 5K reduction in sentence because the Government claimed that his cooperation was not substantial and he "operated a[n] information-selling scam," but that he was never prosecuted for this activity and, in fact, the Government advocated for a reduced sentence for another prisoner, Greg Harris, who engaged in the same sort of activity. T2-69-70.  He contended that Harris lied on the stand in Terrence Franklin's trial. T2:70.

Watkins related that he first began providing information to the Government in 1996, and again in 2007, after he was arrested for the present crime.  T2:70, 71.  He primarily provided information to Tim Brown (who was the lead agent on Watkins' original case), Peter Beck, and Miles Brosas, which encompassed fourteen debriefings through May 5, 2014.  T2:71-72.  He described his working relationship with Brown as good.  T2:73.  He further testified that when Brown introduced him to Beck, it was with the understanding the "way we used to go about doing things would be acceptable

AO 72A
(Rev.8/8
2)

with Mr. Beck, so that's how we rolled." *Id.*  Watkins stated that in cooperating with

Brown, he provided information to him from outside sources, recounting that Brown

had visited him in the jail and asked Watson to call his outside contacts for information.

He testified that in his original Rule 35 hearing, the Government recounted that he

provided information on a fugitive in this fashion.  *Id.*  He did not recall whether he

made any consensually recorded telephone calls for Brown.  T2:73-74.  He claims that

he had the same arrangement with Beck that he had with Brown, that is, he obtained

information from outside sources and he introduced other inmates to Beck who were

receiving information from Watkins' outside sources, just like the Government

explained in his 2000 Rule 35 hearing.  T2:74.  He testified that Beck credited Watkins

with introducing him to Lumsden.  *Id.*

Watkins testified that Brown described his cooperation as "job security," and that

AUSA Jordan then began to accept Watkins' cooperation efforts.  T2:75.

He also testified that the agents always accepted his collect telephone calls, and

invited him to call, even after the U.S. Attorney's Office had instructed Brosas not to

use him anymore, but did not come to see him.  T2:76-77.  He testified that on

September 6, 2011, he gave information to Brosas that allowed law enforcement to stop

a violent jail break form the Union City Jail.  T2:77-78.  Afterwards, Watkins was

22

moved from general population to segregation because one of the inmates whose escape was thwarted by Watkins' information was threatening to kill Watkins. T2:78-79.

Watkins recounted that he was debriefed fourteen times over nineteen to twenty months, and during no debriefing did an agent question his veracity. T2:79.

He also testified that he gave information to AUSA Jordan and Agent Beck in April 2008 about a person who subsequently was arrested, cooperated, and received a reduced sentence. T2:79-80. Watkins claimed that the information he gave formed the basis of, or was contained within, the Title III wiretap application in that case. T2:80-81. He also testified that he gave information to the Government about several other defendants against whom the Government brought charges. T2:81-82. He further testified that he believed that the information that he gave to Leon Lumsden formed the basis for Lumsden's reduction in sentence. T2:83-85, 95-97. He contends that his information about M&M/Jamaican Steve was corroborated by evidence in the record. T2:85-86. He passed along information from his cousin to Harvey. T2:86-87. He also cooperated with HIDTA against William Steven Hutchinson a/k/a Wild Man Steve, but that is the case in which the drug buy went bad and that HIDTA refused to deal with Watkins thereafter. T2:87.

23

On cross-examination, he recognized that the Government contends that it stopped working with him when it discovered that he was buying and selling information.  T2:90.  He acknowledged that he brokered information to Harvey for a fee of $3,000.  T2:90-91.  He also acknowledged that in his 1996 case, he received a reduction in his sentence in part because he reported to the Government that inmates were selling information to other inmates and instructing those inmates to lie on the stand during trial.  T2:91.  He disputed that the criminality in that earlier case was the purchasing of information as opposed to the inmates' lies that they were involved with the defendant in that earlier case when in fact they were not.  T2:92.

On redirect examination, Watkins denied that he gave any information to other inmates or agents that was not true, or that he advised inmates to lie to the agents or in court.  T2:94.  He distinguished his activities from those as to which he cooperated against in 1996, because in that earlier case, the inmates were going to testify falsely that they had personal dealings with the defendant in that case, which was untrue.  *Id.* However, he also acknowledged that none of the information as to M&M or Hutchinson resulted in an arrest.  T2:100.

Agent Brosas testified that Watkins provided information to him when he was investigating a case at the Atlanta City Detention Center, and in that regard, met with

24

Watkins numerous times.  T2:102-03.  Brosas passed on Watkins' information about the escape plan, but is unsure of whether the information was useful or prevented an escape, and he was unsure whether anyone was prosecuted for the alleged escape plan. T2:104.  He also testified that although he met with Watkins on numerous occasions and received correspondence form him, no one was arrested or sentenced as a result of his information.  T2:104-05.  Although on cross-examination, Brosas could not recall being advised that Watkins was not viewed as credible, T2:107, on redirect examination, Brosas was shown his earlier testimony and his affidavit, and acknowledged that because of Watkins' information selling scheme, in 2008, he was instructed that Watkins' credibility was suspect and was advised not to work with him any more.  T2:114.  He also recalled being advised that his information about corruption at ACDC did not pan out.  *Id.*  Although he was instructed not to work with Watkins, Watkins kept sending him letters.  T2:114-15.  He acknowledged that after debriefing Watkins on November 5, 2008 about corruption at ACDC, he was advised by the U.S. Attorney's Office not to have further dealings with him because his credibility was weakened due to the information-selling scheme, and Brosas interpreted this instruction to not use his information.  T2:116.  Despite that, he read most of the

25

letters that Watkins wrote to him thereafter.[10]  He passed along information from three of the letters.  T2:118.  He also engaged in telephone calls with Watkins.  T2:122.  However, he denied telling Watkins that he would ask the U.S. Attorney's Office for leniency or a reduction of sentence as a result of any of Watkins' efforts to cooperate.  T2:124.

## III.    *Applicable Law*

The Government has the power, but not the duty, to file a substantial-assistance motion when the defendant has provided substantial assistance.  *See Wade v. United States*, 504 U.S. 181, 185 (1992) (addressing the Government's failure to file a substantial-assistance motion in the U.S.S.G. § 5K1.1 context); *United States v. McNeese*, 547 F.3d 1307, 1308-09 (11th Cir. 2008) (applying *Wade* in the Federal Rule of Criminal Procedure 35(b) context). Federal district courts may review the Government's refusal to file a substantial-assistance motion if the defendant first makes a "substantial threshold showing" that the refusal was based upon an unconstitutional motive, such as race or religion.  *Wade*, 504 U.S. at 185-86.  In addition, review would

---

[10]    The letters from Watkins were dated March 19, September 7, October 8, October 29, December 1, December 27, and December 31, 2010; and January 8, January 29, February 5, February 26, April 4, April 23, June 13, June 15, June 20, June 24, July 5, July 26, August 9, August 25, August 29, August 30, and September 5, 2011.  T2:117-18.

26

also be authorized where the prosecutor's motive in refusing to move "was not rationally related to any legitimate Government end." *Id.* at 186.  However, a defendant is not entitled to a remedy or even an evidentiary hearing where he merely claims that he provided substantial assistance or makes generalized allegations of improper motive; instead, he must make a "substantial threshold showing" of improper motive.  *Id.*  In applying *Wade*, the Eleventh Circuit has stated that, when the Government does not file a motion for substantial assistance, "courts are precluded from intruding into prosecutorial discretion," except where there is "an allegation and a substantial showing that the prosecution refused to file a substantial assistance motion because of a constitutionally impermissible motivation, such as race or religion." *United States v. Forney*, 9 F.3d 1492, 1501-02 (11th Cir. 1993).  "[A]rguments that the government had motivations beyond the defendant's provision of substantial assistance do not satisfy the Supreme Court's unconstitutional-motive standard for review."  *McNeese*, 547 F.3d at 1308.  Consequently, the Eleventh Circuit has rejected the argument that judicial review of a prosecutor's decision not to file a Rule 35 motion would be proper where a defendant alleged that the Government's refusal to file was in bad faith, but not unconstitutionally motivated.  *See id.* at 1501 n.4 (explaining that review is appropriate only when an unconstitutional motive has been alleged, as other analyses would invade

27

prosecutorial discretion and contradict *Wade*); *see also United States v. Nealy*, 232 F.3d 825, 831 (11th Cir. 2000) (limiting "our review of the government's refusal to file substantial assistance motions to claims of unconstitutional motive"); *see also United States v. Uribe*, 486 Fed. Appx. 823, 825-26 (11th Cir. Aug. 14, 2012).

It is worth noting that " '[t]he substantial assistance regime is not a spoils system designed simply to reward a cooperative defendant; it is designed to benefit the government in its prosecution efforts.' " *United States v. Hickey*, 719 Fed. Appx. 1000, 1001 (11th Cir. Apr. 20, 2018) (quoting *United States v. Orozco*, 160 F.3d 1309, 1316 (11th Cir. 1998) (quotation marks omitted)).   A defendant's argument that the Government could not refuse to file a substantial-assistance motion for "reasons other than the nature of [defendant's] substantial assistance" was not supported by *Wade*, and it was contrary to the "broad grant of prosecutorial discretion recognized by" the Eleventh Circuit.   *Nealy*, 232 F.3d at 831 (quotation marks omitted) (brackets in original).   Thus, a defendant must demonstrate that the Government refused or failed to move to reduce a defendant's sentence was based on unconstitutional reasons.   *Hickey*, 719 Fed. Appx. at 1001.   " 'A defendant who merely claims to have provided substantial assistance or who makes only generalized allegations of an improper motive is not entitled to a remedy or to even an evidentiary hearing.' " *United*

28

*States v. Bagui-Solis*, No. 17-14713, 2019 WL 2024809, at *2 (11th Cir. May 8, 2019) (quoting *United States v. Dorsey*, 554 F.3d 958, 961 (11th Cir. 2009)); *see also Wade*, 504 U.S. at 186; *Forney*, 9 F.3d at 1501 n.4, 1502 n.5 (explaining that generalized allegations of bad faith are not sufficient under *Wade*).

## IV.    Discussion

Watkins' argument is that the Government was unconstitutionally vindictive by refusing to file a motion for reduction of sentence because he attempted to disclose embarrassing if not criminal conduct by federal law enforcement officers and prosecutors, and that its reasons for not filing a sentence-reduction motion refusal—that his cooperation was not substantial and that he lacked credibility because he was engaged in a "5K-selling" scheme—are pretextual. As proof of pretext, he argues that the Government previously moved for a reduction in sentence for Greg Harris, who Watkins claimed also had been accused of "selling" sentence-reduction information.

Assuming without deciding that vindictiveness of the sort Watkins alleges falls within the limited judicial review of the Government's discretion in refusing to file a reduction-in-sentence motion in this case,[11] Watkins's arguments fail. First, a motion

---

[11]    The Court is not aware of any Eleventh Circuit case that expands judicial review under *Wade* beyond an unconstitutional motive, such as race or religion. *Wade*, 504 U.S. at 185-86. The Eleventh Circuit has limited judicial review of the

AO 72A
(Rev.8/8
2)

by the Government is a prerequisite to a district court's reduction of a defendant's sentence because of his substantial assistance to the Government toward the investigation and/or conviction of another person.   *United States v. Alamin*, 895 F.2d 1335, 1337 (11ᵗʰ Cir.1990).   Thus, the subjective appraisal of a defendant as to his entitlement to a sentence reduction is irrelevant.   Watkins acknowledged this in his plea agreement, whose express terms provide that he "understands that the determination as to whether he has provided 'substantial assistance' rests solely with the Government.   Good faith efforts by the defendant that do not substantially assist in

---

Government's refusal to file a sentence-reduction motion " 'when there is an allegation [of bad faith] *and* a substantial showing that the prosecution refused to file a substantial assistance motion because of a constitutionally impermissible motivation, such as race or religion.' " *United States v. Scott*, 184 Fed. Appx. 916, 918 (11ᵗʰ Cir. June 20, 2006) (quoting *Forney*, 9 F.3d at 1502).   *Forney* points out that in its *Wade* decision, the Supreme Court relied heavily on language in *Wayte v. United States*, 470 U.S. 598 (1985).   *See Forney*, 9 F.3d at 1501 n.4.   In *Wayte*, the Court dealt with review of selective-prosecution claims, holding that such claims are subject to ordinary equal protection standards, that is, "the decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Wayte*, 470 U.S. at 608 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)) (punctuation altered).   Thus, Watkins' vindictiveness argument, since it is not based upon his race, religion, or other arbitrary classification, may be beyond *Wade*'s protections.   On the other hand, *Wade* did hold that an aggrieved defendant could be entitled to relief where Nonetheless, the Court need not decide whether a *Wade* claim would be made if a defendant could show that the prosecutor's motive in refusing to move "was not rationally related to any legitimate Government end," *Wade*, 504 U.S. at 186, and bad faith vindictiveness would satisfy that standard.

30

the investigation or prosecution of another person who has committed a crime will not result in either a motion for downward departure or a Rule 35 motion." [Doc. 46-1 at 4-5]. It is significant that the Government, through either its prosecutors or law enforcement agents, did not view Watkins's information provided as a result of his most recent case to constitute substantial assistance. Although he claimed that the information he gave to law enforcement led to the indictment and arrest of at least three individuals, T1:46-47, 47-48, 50; Def. Exs. 1, 2, 3, none of the law enforcement agents who testified at his hearings considered his information to constitute substantial assistance, and the record contains no evidence supportive of Watkins' claims that persons were indicted and arrested as a result of his information. Beck explained that the information that Watkins provided about conduct with which he was charged did not pan out since the robbery victim no longer wanted to cooperate, and the investigating agents could not find either the accomplice or Pork Chop, the supposed source of the firearm. T1:122, 124. Further, none of the other information about crimes on the street panned out, T1:125-127, or was too historical to be of any use to the ATF. T1:128-129, 135. Other information passed along by Beck to other agencies was rejected because these other agencies did not want to work with Watkins based on past experiences, T1:136-37, or simply was deemed not valuable. T1:137.

31

Further, none of Watkins' information provided to Brosas led to a prosecution. T1:158. The record is undisputed that the Government viewed his persistent efforts at cooperating as not substantial and his credibility poor.

Second, Watkins did not prove that the Government's failure to file a sentence-reduction motion was motivated by unconstitutional vindictiveness. His argument that the Government sought to cover up its failure to prevent a shooting at the Game Room and retaliated against his disclosure of this supposed misconduct is not supported by the evidence. As the evidence introduced in the record demonstrates, the Game Room shooting was an independent event unrelated to any investigation being conducted by the Government. T1:133-34, 141. Neither this claim nor any other claim of prosecutorial or law enforcement misconduct were substantiated. T1:177. The record evidence demonstrates that Watkins' claims of Government misconduct are built on supposition and unsupported inferences. Further, it is significant in the Court's view that Watkins offered no cross-examination of any of the law enforcement agents who denied wrongdoing or improper motive and concluded that Watkins' information did not rise to the level of substantial assistance, or Summers, the investigator assigned to evaluate Watkins' claims of misconduct, who found no substantiation of his claims.

32

Third, the record evidence demonstrates that Watkins was involved in a 5K/Rule 35-selling scheme that the Government correctly viewed as undermining Watkins's credibility as an informant or a witness.  The evidence was undisputed, through Harvey's testimony and the evidence corroborating Harvey's testimony, that Watkins established a 5K/Rule 35-selling operation.  In fact, Watkins's plea agreement expressly provided that if he engaged in additional criminal conduct or other conduct inconsistent with cooperation, he would not be entitled to any consideration whatsoever pursuant to the cooperation provision of his plea agreement.  *See* n.3 *supra.*

Fourth, the Court rejects Watkins' pretext argument.  Harris is not a proper comparator of Defendant because the information that Harris gave to the Government was deemed substantial assistance.  Based on Watkins's allegations of Government misconduct in this case, the Court *sua sponte* ordered from archives the pleadings and files in Harris's case, No. 1:90-cr-266-06 (N.D. Ga.).  The files were contained in 16 bankers boxes, and the pleadings and documents related to Harris were interspersed with documents related to co-defendants in that action.  The Court reviewed all of the documents and retrieved those documents that concerned Harris's multiple efforts to receive a reduction of sentence.  The Court provided these documents to counsel for the parties and set an additional briefing schedule.  [Doc. 224].  (The documents that the

33

Court provided to the parties are filed under seal contemporaneously with this R&R as a Court Exhibit.)   Following receipt of the Harris documents, Watkins has not supplemented his filings with other arguments as to why Harris is an appropriate comparator or that the Government's reasons for not filing a motion to reduce his sentence are pretextual, or argued that there were other documents that the Court should have reviewed.   (*See* Dkt.).

This is what the archived records show.  Following a jury trial, Harris was found guilty of one count of violating 21 U.S.C. § 846, *see* Dkt. Entry 209 in 1:90-cr-266-JOF-ECS-06, and on May 19, 1992 was sentenced to 292 months in custody. Dkt. Entries 5/19/1992 and 255 in 1:09-cr-22-06.  The judgment was corrected on April 17, 1996, *id.* at Dkt. Entry 366, but the custodial portion of the sentence remained the same.  On July 1, 1997, the Government advised the sentencing court (Judge Forrester) that Harris provided substantial assistance to it in the investigation and prosecution of other persons, and therefore moved for a reduction of sentence under Fed. R. Crim. P. 35(b).  *See* Doc. 387 at 1 in 1:09-cr-266-06 (under seal) (N.D. Ga. July 1, 1997).  In the motion, the Government set forth the nature and extent of Harris's assistance, *id.* at 1-6, and attached a DEA Form 6 report to the motion.  *Id.* 7-9.

34

Although Judge Forrester held a hearing, *id.* at Dkt. Entry 390, the motion was never ruled upon.  *See* Dkt. in 1:90-cr-266.

Then, in 1:99-cr-684-GET-ECS-2, following his guilty plea to violating 18 U.S.C. § 371, Harris was sentenced to 15 months in custody.  Dkt. Entry 32 in 1:99-cr-684-2.  Presumably this conviction resulted from Harris's involvement in a 5K/Rule 35-selling scheme.  On July 15, 2001, the Government filed a motion to reduce Harris's sentence for his substantial assistance to the Government.  Dkt. Entry 42 at 1-2 in 1:99-cr-684-2.[12]  The District Judge in that case, Judge Tidwell, referred the motion to Judge Forrester in Case No. 1:90-cr-266-06.  The motion provided that Harris provided detailed information about an individual who similarly attempted to obstruct justice in order to obtain a Rule 35 reduction, for which the target was indicted and convicted in the Southern District of Georgia, and made consensual recordings of another individual in this district who made up information and provided it to the DEA in an effort to get a sentence reduction.  Dkt. Entry 467 in 1:90-cr-266-06.  On August 14, 2001, Judge Forrester reduced Harris' custodial sentence to 121 months plus 10 days.  Dkt. Entry 471 in 1:90-cr-266-06.

---

[12]    The Government noted in that motion that Harris did not receive any reduction of sentence based on the Rule 35(b) motion filed in 1:90-cr-266-06 "due to jurisdictional matters."  Dkt. Entry 42 in 1:99-cr-684-2.

AO 72A
(Rev.8/8
2)

Compare Watkins to Harris.  Watkins did not acknowledge that he was doing anything wrong in his most recent 5K/Rule 35-selling scheme.  At the hearing before Judge Carnes, he sought to distinguish his more recent conduct from that in which he engaged in the past, by stating that there was no intent that the inmate buying the information would testify but only that the information would be used to start or assist an ongoing investigation or to make an arrest.  T1:91.  He further testified that, in his more recent activities, the inmates receiving information could not testify, because they would be unable to identify the defendant who was the target of the cooperation in court.  T1:91-92.[13]  However, Watkins did not instruct these inmates to tell the agents that they had purchased the information.  T1:92.  In fact, he admitted that he did not tell Beck or Brosas that he was selling information to other inmates, T1:105, testifying, basically, that they had to know.  T1:106-07.  Although he attempts to distinguish his case from Harris's by stating that he (Watkins) was not prosecuted for the 5K/Rule 35-selling scheme, what actually distinguishes his case from Harris's is Harris's admission of wrongdoing and his active cooperation against others involved in similar schemes.

In short, Watkins has not demonstrated that the Government acted improperly in not filing a motion for reduction of sentence for substantial assistance.  As a result,

---

[13]     Watkins testified similarly before Judge Walker.  T2:94.

AO 72A
(Rev.8/8
2)

the Government has not violated the plea agreement by not filing a motion to reduce his sentence for substantial assistance.

## V.     *Conclusion*

In conclusion, for all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Watkins's motion to enforce the plea agreement, [Doc. 86], be **DENIED**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned.

**IT IS SO RECOMMENDED AND DIRECTED**, this the 11th day of July, 2019.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)